IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | 4:06CR3027 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| JAIME LAMON ESQUIVEL, | ) | |
| RICARDO ESQUIVEL, JR. and | ) | |
| RUBEN DARIO NUNEZ, | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court on the Magistrate Judge's Recommendation—made orally at the conclusion of the suppression hearing (filing 63, Tr. (hereinafter "Tr.") at 86-91)—that the defendants' motions to suppress (filings 44, 46, & 48) be denied. Defendant Ricardo Esquivel, Jr. did not object to the Recommendation. Defendants Jaime Leon Esquivel[1] and Ruben Dario Nunez objected to the Recommendation (filings 65 & 67) pursuant to 28 U.S.C. § 636(b)(1)(C) and NECrimR 57.3. After a de novo review of the Magistrate Judge's Recommendation pursuant to 28 U.S.C. § 636(b)(1) and NECrimR 57.3, I conclude that the Magistrate Judge's Recommendation should be adopted; the objections of defendants Jaime Leon Esquivel and Ruben Dario Nunez (filings 65 & 67) to the Recommendation should be denied; and the defendants' motions to suppress (filings 44, 46, & 48) should be denied for the reasons articulated by Magistrate Judge Piester (filing 63, at 86-91).

This motion concerns a traffic stop, interdiction questions, and a vehicle search which resulted in the discovery of heroin. Jaime Leon Esquivel ("Esquivel") was the

---

[1] Jaime Leon Esquivel filed a motion for extension of time to file his objection (filing 64), yet later filed his objection within the original time limits (filing 67). I deny the motion for extension as moot.

driver of a Dodge Stratus traveling on Interstate 80. His nephew, Ricardo Esquivel, Jr. ("Esquivel, Jr.") was a passenger riding in the front passenger seat. Ruben Dario Nunez ("Nunez"), another nephew, was riding in the rear passenger seat. Trooper Jeff Roby observed that the Dodge Stratus did not appear to have license plates or in-transit stickers and initiated a traffic stop. (Tr. 9-11.) The Magistrate Judge found that there was nothing to indicate that Roby's belief that there was a traffic infraction was objectively unreasonable. (Tr. 86.) Neither Esquivel nor Nunez has objected to this finding.

Roby approached the vehicle to ask the driver (Esquivel) for his license and registration. (Tr 12.) This was at approximately 8:19 a.m. (Filing 59, Ex. 1 (videotape), hereinafter "Ex. 1".) While Esquivel was looking for this information, Roby observed a 5 inch by 4.5 inch piece of paper taped to the front windshield which appeared to be a temporary registration, or in-transit certificate, from Nevada. (Tr. 12-13.) At that time, Roby believed that the temporary registration "looked legitimate." (Tr. 61.) Roby received and reviewed Esquivel's license and the vehicle rental agreement, which listed Nunez as the renter and listed Esquivel as an additional authorized driver. (Tr. 14; Filing 59, Ex. 4.) Nunez confirmed he had rented the vehicle. (Tr. 16.) By this point, Roby had established that Esquivel was authorized to drive the rental vehicle. (Tr. 61.) Roby nonetheless directed Esquivel to his cruiser. (Tr. 61.) He explained that he had stopped the vehicle because it had no plates, and wanted to make sure that all was "OK." He also asked Esquivel whether he spoke English, and Esquivel responded in English that he did. (Ex. 1 (at 8:21 a.m.).)

While Esquivel was in his cruiser, Roby asked him questions about the nature and purpose of this travel. He learned that the two passengers were Esquivel's nephews and that they were traveling to Chicago for a relative's wedding. They had driven Nunez's pickup truck from their homes in El Centro, California to Las Vegas, Nevada. In Las Vegas, they left Nunez's pickup in a parking lot and rented the

Dodge Stratus to drive the remainder of the way to Chicago. Esquivel stated that they had spend the night in Las Vegas at Queen's casino and had gambled for a while. (Tr. 22-25.) Roby's demeanor was friendly, and he explained that although the temporary registration looked valid, the rental vehicle was required to have plates, and the rental company should take care of this–the absence of plates was not Esquivel's fault. (Ex. 1 (at 8:25 a.m.).) After Roby learned that the defendants had driven one vehicle to Las Vegas and then rented another, and after he had called communications to request a check on Esquivel's documents, Roby advised dispatch that he would be busy with the traffic stop. (Tr. 62; Ex. 1 (at 8:24 a.m.).) While he was talking to Esquivel, State Patrol communications advised Roby that Esquivel had an immigration violation, several marijuana smuggling violations, an assault violation, and a drunk driving violation. (Tr. 24-25.)

Roby then exited his cruiser to obtain identification from the two passengers. Their explanations of the stay in Las Vegas were inconsistent with Esquivel's. They stated that they did not spend the night in Las Vegas, but had stopped there to gamble at a casino (and they named a casino other than the Queen's casino, where Esquivel said they gambled). (Tr. 28.) Roby returned to the patrol unit to run the passengers' drivers licenses and names for warrants. (Tr. 28.) He specifically asked Esquivel if they had stayed the night in Las Vegas, and Esquivel again stated that they had. (Tr. 29, 33.)

After Roby inspected the in transit sticker, he completed a violation card for driving without license plates and handed it to Esquivel. (Tr. 31-32; Filing 59, Ex. 5.) He also handed back the identification card and drivers licences obtained from the three subjects. (Tr. 34.) He again explained that Esquivel should advise the car rental company that he had been stopped for lack of plates and that the car rental company should affix permanent plates. (Ex. 1 (at 8:33 a.m.).) After Esquivel signed the violation card, Roby gave him his copy "and told him that we were done with the traffic stop and to have a safe trip." (Tr. 35.)

Roby then asked Esquivel if he could ask more questions, and Esquivel agreed. Review of the videotape of the stop shows that this occurred eleven minutes after the vehicle was stopped, and immediately after Roby said the traffic stop was complete. The interchange was still congenial, although Roby began talking faster than he previously had been. (Ex. 1.)  Roby asked if there were guns or weapons in the car, and Esquivel said no.  Roby told Esquivel that he had mentioned that he had been arrested for marijuana smuggling, asked if there was marijuana in the vehicle, and was told there was not.  Roby specifically asked if there was any cocaine or methamphetamine in the vehicle and was told there was not. (Tr. 36.)  Roby felt that based on indicators of criminal activity he had learned about in criminal interdiction training, among them the differences between the two stories of the Las Vegas stay, there was a reasonable suspicion of criminal activity and he should search the vehicle. (Tr. 36, 52-54.)  After inquiring about the presence of drugs in the vehicle, Roby asked Esquivel "if I could look through the vehicle and search the vehicle." (Tr. 35.) Esquivel responded "yeah, sure". (Tr. 35.)  This was approximately fifteen minutes after the vehicle was stopped. (Ex. 1 (at approximately 8:35 a.m.).)

During this exchange, Roby spoke in English and believed that Esquivel understood exactly what Roby was saying. Esquivel responded in English. (Tr. 56.) Prior to asking for consent to search, Esquivel had not been handcuffed, had not been shown Roby's weapon or handcuffs, and had not been told he was going to be detained (although he was not free to leave until Roby told him that the traffic stop was over and he should have a safe trip). (Tr. 58, 70.)  No other troopers were then present at the scene, although they arrived shortly thereafter (and before the passengers were asked for consent to search). (Tr. 73-74.)  At the time Esquivel gave permission, his demeanor had not changed and "[t]here was no raising of voice or objection to the question or the answer." (Tr. 55-56.)  Roby did not advise Esquivel that he had the right to refuse consent.

-4-

Roby then approached the passenger side of the vehicle and specifically told Esquivel, Jr. and Nunez that Esquivel had given him permission to search, that Esquivel had problems with marijuana smuggling, and asked if there were drugs in the vehicle. After both passengers said no, Roby asked if he could search the vehicle and was told by both passengers that he could. (Tr. 36.) He did not advise them of the right to refuse consent.

Defendants Jaime Leon Esquivel and Ruben Dario Nunez object to the Report and Recommendation on three grounds: (1) their detention *after* Roby had observed the facially valid Nevada in-transit sticker and had verified that the driver was authorized to operate the rental vehicle was unlawful; (2) information developed by Roby during the stop regarding the details of the travel did not provide reasonable suspicion for their continued detention, and (3) the taint of unlawful detention was not purged by consent to search. I address these objections in turn.

### When was Purpose of Traffic Stop Complete?

Trooper Roby learned very early in the investigative stop that despite his initial reasonable belief that the vehicle had no license plates or registration sticker, the vehicle had a facially valid Nevada in-transit sticker. He also quickly learned that Esquivel was authorized to drive the rental vehicle. Esquivel and Nunez assert that the purpose of a traffic stop is "completed" once the officer learns that the original reason for the stop is not justified by the facts as they develop, such that any inquiry of them had to end once Trooper Roby concluded that the vehicle had a facially legitimate Nevada temporary registration and Esquivel was authorized to drive the vehicle. This is not the law in the Eighth Circuit.

"Once officers legitimately stop a vehicle, they are entitled to conduct an investigation that is reasonably related in scope to the circumstances that <u>initially justified the stop</u>." United States v. Bueno, 443 F.3d. 1017, 1025 (8th Cir. 2006)

(police officers' reasonable suspicion that vehicle lacked license plates or registration justified traffic stop; although this initial suspicion was dispelled when officers approached stopped vehicle and saw temporary vehicle registration, officers could conduct a reasonable investigation incident to the traffic stop) (emphasis added). A reasonable investigation incident to a traffic stop includes "asking the driver for his license and registration, requesting him to sit in the patrol car, and inquiring as to the driver's destination and purpose." Id. It also includes questioning a vehicle's passengers to verify information provided by the driver. United States v. Sanchez, 417 F.3d 971, 975 (8th Cir. 2005).

Even when the reasonable suspicion for a valid traffic stop proves to be unfounded before the investigation is completed, the initial reasonable suspicion provides grounds to complete the investigation. In other words, the "purpose" of a traffic stop is not "completed" until an investigation reasonably related in scope to the circumstances that initially justified the stop has been completed. Bueno, 443 F.3d at 1025. See also Sanchez, 417 F.3d at 975. As Esquivel's brief notes, although the officer in Bueno learned that his original suspicion that a traffic violation had occurred was unfounded, during the stop that officer discovered a new fact that created reasonable suspicion (when the officer read the temporary registration, he discovered that the vehicle did not belong to the driver–who was the sole occupant). However, nothing in Bueno limits its application to circumstances when the dispelled suspicion is replaced by another.

### Was There Reasonable Suspicion for Continued Detention?

When Trooper Roby questioned the driver and passengers about the destination and purpose of the trip, the defendants did not agree on whether they had spent the night in Las Vegas. In addition, Roby learned that the travelers had driven Nunez's vehicle from their origination point of El Centro, California to Las Vegas, left that vehicle in a parking lot in Las Vegas, and rented a vehicle for the remainder of the

drive to Chicago.[2]  Roby was advised by the dispatcher that Esquivel had multiple marijuana smuggling violations.  Judge Piester found, and I agree, that these facts created a reasonable, articulable suspicion of criminal activity that justified extension of the traffic stop.

The standard for reasonable suspicion requires only "'particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed.'"  United States v. Chhunn, 11 F.3d 107, 109-10 (8th Cir. 1993) (quoting United States v. Martin, 706 F. 2d 263, 265 (8th Cir. 1983)).  Even if individual actions could be innocently explained, the circumstances "must be considered as a whole and in the light of the officers' 'experience and specialized training.'"  United States v. Yang, 345 F.3d 650, 655 (8th Cir. 2003) (internal citation omitted).  Esquivel argues that there was nothing suspicious about driving Nunez's vehicle to Las Vegas and then renting a car for the remainder, and major portion, of the trip to Chicago, since Nunez's vehicle was a rusted-out light pickup truck and Las Vegas was the "nearest major rental car agency." (Filing 69, Esquivel Br. at 9.)  However, there were no facts at the hearing to support this argument.  More importantly, even if this explanation is accurate, Trooper Roby was unaware of these facts at the time of the traffic stop.

**Was Taint of Unlawful Detention Purged by Consents to Search?**

I also agree with the Magistrate Judge that if there was no reasonable suspicion to expand the stop (and there was), the voluntary consents of Esquivel and Nunez purged the taint of illegal detention preceding the search.  If a search follows an unlawful detention, it is the government's burden to prove, by a preponderance of the

---

[2]An internet search on Mapquest tells me that the journey from El Centro to Chicago is approximately 2040 miles, and would consume nearly 30 hours.  The El Centro to Las Vegas leg of the journey is approximately 385 miles, and would consume just over 6 hours–roughly one-fifth of the total trip.

evidence, that the defendant's consent to the search was, in fact, "voluntary in the sense that it was sufficiently an act of free will to purge the primary taint of the illegal seizure." United States v. Yousif, 308 F.3d 820, 830 (8th Cir.2002). Whether consent was an act of free will is determined based on the totality of the circumstances, and three factors are considered: "(1) the temporal proximity between the illegal search or seizure and the consent, (2) the presence of intervening circumstances, and (3) the purpose and flagrancy of the official misconduct." Id. (citing United States v. Moreno, 280 F.3d 898, 900 (8th Cir.2002) and Brown v. Illinois, 422 U.S. 590, 95 S. Ct. 2254,(1975)). The most critical factor is "the purpose and flagrancy of the official misconduct." United States v. McGill, 125 F.3d 642, 644 (8th Cir. 1997), cert. denied, 522 U.S. 1141 (1998) (citing Brown v. Illinois, 422 U.S. 590, 604 (1975). If the officer "was not attempting to exploit an illegal situation," it is likely that the consent was voluntary. United States v. Perry, 437 F.3d 782, 786 (8th Cir. 2006) (quoting United States v. Moreno, 280 F.3d 898, 901 (8th Cir. 2002), which cites United States v. Ramos, 42 F.3d 1160, 1164 (8th Cir. 1994)).

Here, there was little time between the search and the consents and the officer who requested consent did not state that Esquivel and Nunez had the right to withhold consent. These circumstances would weigh against voluntariness.[3] However, more factors weigh in favor of voluntariness. Neither Esquivel nor Nunez were in custody or being detained when they consented. Roby had already handed Esquivel his copy of the violation card, told him that "we were done with the traffic stop" and "to have a safe trip." (Tr. 35.) United States v. Williams. 431 F.3d 296, 299 (8th Cir. 2005) (fact that defendant not in custody at time of consent an indication that voluntary

---

[3]Although officers are not required to inform a person that he does not have to consent, it is still a circumstance that must be considered. See United States v. Palacios-Suarez, 149 F.3d 770, 773 (8th Cir.1998) (concluding that the defendant's consent was an act of free will, even though the police officer did not explain to the defendant that he could withhold consent)

consent purged taint). There is no indication that Esquivel or Nunez had problems understanding English. The stop occurred by the side of an interstate highway during daylight, not in some secluded place.

Most significantly, there is no indication that Roby was attempting to exploit an illegal situation. There was no evidence that the vehicle was stopped as part of a preconceived plan to obtain consent to search it. Id. (this was key circumstance indicating consent purged taint). It is undisputed that the initial stop of the vehicle was based on an objectively reasonable belief that a traffic violation had occurred. Esquivel and Nunez point to Roby's statement to State Patrol communications that he would be "busy" with the stop and their ethnicity as evidence that the stop was a pretext to find drugs. However, the stop was initiated before the ethnicity of the occupants of the vehicle was apparent. Roby's statement that he would be "busy" was not made until after he learned of a fact that could likely lead to a reasonable suspicion of criminal activity, depending on all the circumstances (the defendants had driven one vehicle for one-fifth of the journey, to Las Vegas, and there rented another vehicle to complete the trip). Nunez also asserts that the fact that three additional officers arrived on the scene, one of them with a drug dog, was threatening and indicated an intention by Roby to seize and question his subjects regardless of cause. I reject this argument, as the initial stop was based on the reasonable belief that a traffic violation had occurred and not on pretext, and it is not unusual for additional officers to assist an officer without a partner. I conclude that even if Trooper Roby's conduct was technically illegal, his conduct was in good faith, and the constitutional violation was not flagrant. I find that the consents of Esquivel and Nunez were voluntary and made under circumstances that purged the taint of any illegal detention.

IT IS ORDERED:

1.   The Magistrate Judge's Recommendation (Tr. 86-91) is adopted;

2. The motion for extension of time for defendant Jaime Leon Esquivel to file his objection (filing 64) is denied as moot;

3. The objections to the Recommendation (filings 65 & 67) are denied;

4. The motions to suppress (filings 44, 46, & 48) are denied; and

5. The Clerk of Court shall provide a copy of this Memorandum and Order to the assigned Magistrate Judge.

June 14, 2006.                              BY THE COURT:

                                            *s/Richard G. Kopf*
                                            United States District Judge